Ann P. Jenckes, et als. *v.* The Court of Probate of Smithfield.

The 10th section of the act respecting guardians, which declares that all contracts, bargains and conveyances, made by any person under guardianship, shall be utterly void, does not apply to wills or devises, they not being within the meaning of the term " conveyances."

A person, placed under guardianship for want of discretion in the management of his estate, whereby he is likely to bring himself and family to want and become chargeable to the town, is not thereby disqualified from making a will.

Where a person is proved to have entertained an insane delusion towards one member of his family, sometime before the making of his will, he must be proved to have recovered therefrom at the date of the will, or it will be void.

Where a woman having three sisters, one married but childless, the others single, made her will while in the family of her guardian, and gave her personal estate to her three sisters, but her real estate composing the bulk of her property to her two maiden sisters for life and after them to her guardian for life and then to his son in fee, it appearing that her sisters were sufficiently provided for and that she had always expressed great affection for her guardian, the Court held there was nothing in the provisions of the will or the circumstances under which it was made to lead to the inference that it was procured by undue influence.

This was an appeal from a decree of the Court of Probate of Smithfield, proving and approving the will of Hannah Jenckes. The reasons of appeal were; first, that the testatrix was a lunatic and non-compos mentis ; second, that the will was procured through importunity, under influence and circumvention ; third, that the testa-

trix was under the guardianship, at the execution of said instrument, of Leonard Follett, who is named trustee and executor thereof ; fourth, that two members of the Court of Probate were witnesses, and sat and passed judgment upon their own testimony in regard to the sanity of said testatrix. The will bears date, January 21st, 1852. The letters of guardianship were granted September 27th, 1851, upon the judgment of the Court that the testatrix wanted discretion in the management of her estate. The facts are sufficiently stated in the opinion.

*Ames* and *Randall* for the appellants.

*A. C. Greene* and *Robinson* for the appellee.

GREENE, C. J., delivered the opinion of the Court.

This is an appeal from a decree of the Court of Probate of Smithfield, approving the will of Hannah Jenckes.

The first objection to the probate is founded on the letters of guardianship over the person and estate of the testatrix, issued under the authority of the Court of Probate of Smithfield. By the 10th section of the act respecting of guardians, (Dig. of 1844, p. 274,) it is declared that all contracts, bargains and conveyances, made by any person under guardianship, shall be utterly void, and it is contended a will is a conveyance in the sense of this section. We do not think so. In the first place, the term " convey" is a technical term, long known and used in deeds conveying real estate and never known or used in a will or devise, any more than the terms " bequath" " or devise" are used in a deed. The term " give" is used in devises and deeds, because a gift may be by deed as well as by devise. To call a devise therefore a conveyance

violates all propriety of legal language. It is true a devise may be considered as an alienation, as contradistinguished from a title by descent, but it is not therefore a conveyance. The term alienation embraces every mode of passing real estate by the act of the party, as distinguished from passing it by the operation of law. It should also be remarked in this connexion, that a devise was unknown to the common law and cannot be considered therefore as embraced by the term " conveyance," unless this meaning has been acquired by subsequent adoption or use.

In the next place, the General Assembly have shown the meaning which they attach to this term. The section of the act regulating conveyances of real estate, provides that all bargains, sales and other conveyances whatsoever of any lands, tenements or hereditaments, &c., shall be void, unless they be acknowledged and recorded. It has never been suggested that a devise was within this section. See also to the same effect, sections 6 & 7 of the same act.

Then as to the justice and propriety of such a construction ;—the third section of the act respecting guardians, (Dig. of 1844, p. 272,) enumerates idiots, lunatics or persons non-compotes mentis, and persons who, for want of discretion in managing their estate, shall be likely to bring themselves and families to want and thereby render themselves chargeable, &c., as persons subject to be placed under guardianship. Can it be reasonably supposed that the General Assembly intended to place the last class of persons enumerated, on the same footing with idiots, lunatics, or persons non-compotes mentis, in reference to their capacity to make a will ?

The statute in relation to wills authorizes every person of sane mind to make a will, and is there any reason

for saying that a person, who wants discretion in the management of his estate, and is likely to spend it, is not of sane mind ? It is not a want of discretion or judgment which disables ; it is insanity. The testator has a right to exercise his own discretion and judgment and, if he is wanting in both, it does not affect the validity of his will, if he be sane. The argument makes the want of discretion, which shall subject a party to be put under guardianship, equivalent to the want of a sane mind.

Besides, the ground on which indiscret persons are made subject to guardianship, is the liability of the town to become chargeable for their maintenance. And to make the disability effective, the law declares all contracts, &c., of such persons void. But this object does not require or authorize any interference with the making of wills. It would abridge an important right of property, without any other reason than the danger that it might be injuriously exercised. If any disability of this sort, so extraordinary in its character, had been intended by the General Assembly, they would have said so in terms, and not left their intent to new, and to say the least of it, doubtful construction by the use of the term conveyance.

The practice of the Courts of Probate in the different towns, long continued, is worthy of careful consideration in the construction of a practical provision of statute law like this, and, it is believed, the practice of these Courts have been uniformly against the construction contended for by the appellants.

We lay out of the case therefore the letters of guardianship, so far as they are considered as avoiding the will under the 10th section of the act referred to.

Ought they to have any effect ? The order of the Court of Probate states the testatrix was put under guardianship,

because she wanted discretion in the management of her estate. This is obviously void; the authority to appoint exists only, where the want of discretion is such that the party will be likely to bring himself and family to want and thereby become chargeable. But, if a proper case was stated and a valid order made, we do not think it should have any effect on the present case, because such a want of discretion does not imply that the party was not of a sane mind. If the appointment had been from idiocy, lunacy, or because the person was non-compos mentis, the case would have been different.

The next objection to the probate of the will is, that the testatrix, at the time she made it, was partially insane, and that the will was made under the influence of such insanity, that the subject of such partial insanity was her brother-in-law, Phetteplace.

She was a maiden lady, and, at the date of the will, about the age of forty-five years. She was a woman of more than ordinary intelligence, and, up to May, 1851, it does not appear that she had ever given any indications of derangement or of a diminution of her powers of mind. At that time, Mrs. Betsey Aldrich says she first observed a change in her mind, and she describes how she appeared, and what she said and did. She was then residing with her brother-in-law, Phetteplace, with whom she had been for several years.

In June, she spent some days with Mrs. Robinson, who describes her appearance and conduct and conversation, while at her house. Whipple Robinson and William Robinson, sons of Mrs. Robinson, both agree with their mother in their testimony. Dr. Stillman also visited her in July, 1851, at the house of Phetteplace, and he gives an account of her appearance, conduct, and conversation at this time.

36

The testimony of these witnesses make out a case of partial insanity in relation to her brother-in-law, which ought to avoid the will, unless the appellees can show she had recovered from this malady at the time of making it.

The subscribing witnesses, one of them the Town Clerk of Smithfield, who drew the will, and the other a member of the Court of Probate, both are full and explicit, not only as to her sanity, but her intelligence and good sense, at the time of making the will. And the man who drew the will conversed with her on other subjects as well as the will, in order to see if there was any appearance of insanity about her. He had heard reported that she was insane, and, before he drew her will, was careful to see if there was any foundation for these reports.

She went to the house of Mrs. Sayles the latter part of July, 1851, and remained there until about the middle of December following, when she went to reside in the family of Mr. Follett, her guardian. Mrs. Sayles has known her for twenty years, and, during her residence in her house, had every opportunity for exact observation of her conduct and conversation. Her testimony is full to the sanity and intelligence of the testatrix, during the whole of her residence in her house. She is confirmed by her son, Larian A. Sayles, who resided with her, and a number of other witnesses testify in regard to the same period, and they all confirm the testimony of Mrs. Sayles. Mrs. Sayles did not see the testatrix after she removed to the house of Mr. Follett.

Ann Hutchins saw her several times at Mr. Follett's, before and during her last sickness. Nancy Cushing, the daughter of Mr. Follett, also saw her several times, while she was at her father's house. Susan Sprague also saw her three weeks before her death, conversed with her about her disease. She said she did not expect to re-

cover. Amey Salisbury saw her at Mr. Follett's. All these witnesses testify to her conduct and conversation up to the time of her death, and she appears to have been calm, resigned and intelligent.

There is but one witness who saw her at the house of Mr. Follett who thinks her insane, and that is Dr. Cook. He visited her professionally at the house of Mrs. Sayles, and also at Mr. Follett's, in June and July, 1852. He thinks she had a monomania on the subject of eating. This being the opinion of an intelligent physician, who visited her professionally, is entitled to careful consideration by the Court. She fancied she could not eat milk, salt or butter, and was averse to eating meat. We are obliged to say we do not think that the reason, on which this opinion is founded, is satisfactory. But, however this may be, Dr. Cook states he could not say her mind was unsound on other subjects, and a monomania on the subject of eating would not affect her capacity to make a will.

After a careful examination, we feel bound to say the evidence of her recovery is satisfactory.

The counsel for the appellants contend her insane views of Phetteplace continued to influence her down to and at the making of the will. It is true, she told Mrs. Sayles, Phetteplace had abused her; he had brought pork and potatoes to her to eat, and said she should eat them. She told him she could not; he then took her and jammed her against the house, and hurt her very much. Ann Phillis, her sister, said to him, "What are you doing? Mr. Mowry is coming up the road, and if you don't let her alone, I will call him." She complained of her neck and shoulders paining her, for some time after she came to Mrs. Sayles'. Afterwards she mentioned this to her sister, Ann Phillis, and said to her, "You know he pushed

you, and you liked to have fallen," and Ann Phillis replied, " Yes."

Does not the manner of this statement indicate not only a sane but a clear mind ? And how is it, if the matter was a crazy delusion, that the manner was so calm and sensible ? Is it not strange, that a person insane upon a particular subject, should converse rationally upon that subject ? Compare her conversation about Phetteplace with Mrs. Sayles or Mr. Knight, with her conversation with Mrs. Aldrich or the Robinsons on the same subject. In the last we see clear evidence of insanity, in the former the contrary.

But it is said that her delusion was in the fact. Is there any evidence of such delusion ? The circumstances she mentions give an appearance of truth to her statement, and her reference to her sister, Ann Phillis, and her acquiescence, and the testimony of Mrs. Sayles, strengthen the probability of its truth. And there is nothing in the case to the contrary, except her conversation with Mrs. Aldrich, previous to May, 1851, in which she told that lady, Phetteplace had been her friend, had assisted her to sell her land to pay debts, and had managed well for her. It will be readily seen, there might well be a motive for this conduct in Phetteplace, independent of personal kindness to her. Besides, when there is an insane delusion about a fact, will there not be some indication of insanity in the manner of conversing about it ?

The man who drew the will observed that she was dissatisfied with Phetteplace and his wife, but she said but little on the subject. This was all proper. She felt her dissolution was not far distant, and she did not wish to converse on a subject which would excite painful feelings. Mr. Knight also observed the same feeling in her towards Phetteplace, and the same reserve in speaking of it.

If we suppose this feeling were all prejudice, still it ought not to affect the will, unless it were an insane prejudice, and we think the evidence negatives any such idea.

The remaining objection to the will is, that it was obtained by undue influence. The testatrix was in feeble health at the time of making her will; she had no near relation who could take care of her, her sisters being her nearest relations. Follett was her guardian; she was living in his family. Nothing is given to her sister, Mrs. Phetteplace, and all her real estate, which composed the bulk of her property, is given to her maiden sisters for life, then to Follett for life, and then to his son in fee. These are undoubtedly facts, which require careful examination, in connexion with the circumstances attending them.

When first applied to, to become the guardian of the testatrix, Follett declined, and when she removed to his house, it was because Mrs. Sayles could no longer entertain her in her family, and not because Follett sought to get her under his own roof. It does not appear from the testimony of the scribe, who drew the will and was a subscribing witness, or from the testimony of the other subscribing witness, or from any other testimony, that Follett exercised any influence over her.

He had been brought up in her father's family with her, and she said he always had been to her as a brother. Then as to the provisions of the will :—Mrs. Phetteplace had no children, and there was no probability she ever would have any, and her other sisters were unmarried. So far as blood was concerned, there was no motive in giving the estate in fee to any of her sisters. So far as support was concerned, Mrs. Phetteplace had a husband to provide for her. All the personal property is given to

the three sisters absolutely, and the real estate for life to the two maiden sisters. This, with what they had of their own, she thougnt sufficient to maintain them.

Under the circumstances, we see no evidence of undue influence by Follett in the provisions for him and his son, after the death of her sisters. The son was named for his father, and she seems to have entertained towards the father and son the kind feelings which their conduct deserved at her hands.

We think the decree of the Court below should be affirmed.